1 | Niveen Ismail
2 | 119 Promontory Dr W
  | Newport Beach, CA 92660
3 |
  | Phone: (949) 723-0033
4 | In Pro Se
5 |
6 |
7 |
8 | # UNITED STATES DISTRICT COURT
9 | ### CENTRAL DISTRICT OF CALIFORNIA

10 | NIVEEN ISMAIL,                          Civil Action No. SACV10-00901 VBF (AJW)
11 |              Plaintiff,                  Three-Judge Court
12 |       v.                                COMPLAINT FOR DAMAGES ARISING OUT
   |                                         OF TORT AND VIOLATION OF STATE
13 |                                         AND FEDERAL CIVIL RIGHTS, IN EXCESS OF
   | COUNTY OF ORANGE, ORANGE COUNTY         $25,000, FRAUD, FALSE IMPRISONMENT, AND
14 | SOCIAL SERVICES AGENCY, SOCIAL          FOR INJUNCTIVE AND DECLATORY RELIEF
   | WORKERS: LAURA TAYLOR, MARY
15 | MADISON, COLLEEN VARGAS, RHEA
   | WREN, STEVE BRODKIN, MARGARET
16 | JORTH, TASSIANA MERVILUS, PAMELA        JURY TRIAL REQUESTED
17 | PANTIRU, VICTOR MOLINA, JULIE
   | FULKERSON, SOCIAL SERVICES             Judges:
18 | SUPERVISORS: DANG VU, INGRID
19 | HARITA, MICHAEL RYAN, CITY OF
   | HUNTINGTON BEACH, HUNTINGTON
20 | BEACH POLICE DEPARTMENT, OFFICER
   | DEXTER, OFFICER SPRUILL, ANGELA
21 | WELLBORN, NEW ALTERNATIVES, INC.,       Department:
   | MICHAEL FORD, SHELBY FORD, each in
22 | their official and individual capacities,
23 |
   |              Defendants.
24 |
25 |
26 | Plaintiff NIVEEN ISMAIL, complains and alleges:
27 | ## JURISDICTION AND VENUE
28 |

COMPLAINT                                                                          1



A.  This action for damages arises under the laws of the United States of America, in particular, Title 42 of the United States Code sections 1983, 1985, and 1986; and the First, Fourth, Fifth and Fourteenth Amendment to the United States Constitution.

B.  This Court has subject matter jurisdiction under 28 United States Code sections 1331(a), and 28 United States Code sections 1343(3) and (4).

C.  Independent of any federal causes of action, this Court has pendent jurisdiction over plaintiff's claims arising under the laws of California.

D.  Venue is proper in this judicial district under pertinent law, including, *inter alia*, 28 United States Code sections 1391(b),(c).

## PARTIES

1.  At all times relevant to this Complaint, Plaintiff NIVEEN ISMAIL ("NIVEEN"), the mother of minor A.I., was and is a resident of Orange County, California.

2.  At all times applicable herein, the COUNTY OF ORANGE was and is a public entity ("COUNTY").

3.  At all times applicable herein, ORANGE COUNTY SOCIAL SERVICES AGENCY ("OCSSA") was and is a subdivision or entity of the COUNTY.

4.  At all times applicable herein, Defendant Social Worker LAURA TAYLOR ("TAYLOR") was an officer, agent, and employee of OCSSA.

5.  At all times applicable herein, Defendant Social Worker MARY MADISON ("MADISON") was an officer, agent, and employee of OCSSA.

6.  At all times applicable herein, Defendant Social Worker RHEA WREN ("WREN") was an officer, agent, and employee of OCSSA.

7.   At all times applicable herein, Defendant Social Worker COLLEEN VARGAS ("VARGAS") was an officer, agent, and employee of OCSSA.

8.  At all times applicable herein, Defendant Social Worker STEVE BRODKIN ("BRODKIN") was an officer, agent, and employee of OCSSA.

9.   At all times applicable herein, Defendant Social Worker MARGARET JORTH ("JORTH") was an officer, agent, and employee of OCSSA.

10. At all times applicable herein, Defendant Social Worker TASSIANA MERVILUS ("MERVILUS") was an officer, agent, and employee of OCSSA.

11. At all times applicable herein, Defendant Social Worker PAMELA PANTIRU ("PANTIRU") was an officer, agent, and employee of OCSSA.

12. At all times applicable herein, Defendant Social Worker VICTOR MOLINA ("MOLINA") was an officer, agent, and employee of OCSSA.

13. At all times applicable herein, Defendant Social Worker JULIE FULKERSON ("FULKERSON") was an officer, agent, and employee of OCSSA.

14. At all times applicable herein, Defendant Social Worker Supervisor DANG VU ("VU") was an officer, agent, and employee of OCSSA.

15. At all times applicable herein, Defendant OCSSA Director INGRID HARITA ("HARITA") was an officer, agent, and employee of OCSSA.

16. At all times applicable herein, Defendant OCSSA Division Director MICHAEL RYAN ("RYAN") was an officer, agent, and employee of OCSSA.

17. Hereinafter, when referred to collectively, the defendants identified in paragraphs 4 through 16 above, will be referred to as "SOCIAL WORKER DEFENDANTS".

18. At all times applicable herein, Defendant CITY of HUNTINGTON BEACH was and is a public entity ("CITY").

19. At all times applicable herein, Defendant HUNTINGTON BEACH POLICE DEPARTMENT ("HBPD") was and is a subdivision or entity of Defendant CITY.

20. At all times applicable herein, Defendant OFFICER DEXTER ("DEXTER") was an officer, agent, and employee of HBPD.

21. At all times applicable herein, Defendant OFFICER SPRUILL ("SPRUILL") was an officer, agent, and employee of HBPD.

22. Hereinafter, when referred to collectively, the defendants identified in paragraphs 20 through 21 above, will be referred to as "POLICE DEFENDANTS".

23.  Defendant ANGELA WELLBORN ("WELLBORN") was at the time of the alleged complaint an employee of NEW ALTERNATIVES, INC., ("NEW ALTERNATIVES"), an agency that contracts with OCSSA and provides monitoring services and parenting classes.

24.  At all times applicable herein, Defendant NEW ALTERNATIVES, INC. ("NEW ALTERNATIVES") was the employer of Defendant WELLBORN and under contract with OCSSA to provide monitoring services and parenting classes on the behalf of OCSSA.

25.  At all times applicable herein, Defendants MICHAEL FORD and SHELBY FORD (" FORD") are the foster parents of minor A.I.

26.  Plaintiff is informed and believes, and on that basis alleges, that each of the Defendants is responsible in some manner for the events and happenings referred to herein, and was the legal cause of injury and damages to Plaintiff as herein alleged.

27.  Plaintiff is informed and believes, and on that basis alleges, that at all times herein mentioned, each and every Defendant was the agent, employee, and/or state actor of their co-defendants, and/or a co-conspirator of a state actor, and each of them, acting at all relevant times herein under color of the authority of a government entity and under the statutes, ordinances, regulations, customs, and usage of the State of California and/or the United States Constitution and related laws.

28.  Plaintiff brings this complaint against all Defendants in their official and individual capacities where applicable.

## COMMON ALLEGATIONS

29.  On December 5, 2005, Plaintiff NIVEEN ISMAIL and minor A.I. lived in a Condo located at 1516 PCH, #108, Huntington Beach, California, 92648 ("Plaintiff's Condo"). The condo was plagued with plumbing problems that frequently resulted in leaks and clogged pipes. Plaintiff had repeatedly expressed her desire to sell her condo and relocate, and was, in fact, in the process of packing.

30.  On said date, Officers DEXTER and SPRUILL, pursuant to a phone call from a resident of the complex, KENNETH GORDON, alleging the child was home alone, entered the condo through a closed but unlocked upstairs window with the help of the Huntington Beach Fire Department.

31.  Officers DEXTER and SPRUILL found minor A.I. in good spirits, healthy and unharmed in his crib a few feet away from the previously closed bedroom window through entry had been made. According to the Huntington Beach Fire Department, minor A.I. said "Hi" to them as they forced their entry through the window.

32.  Officers DEXTER and SPRUILL then proceeded to search Plaintiff's condo without a search warrant or court order.

33.  Officers DEXTER and SPRUILL allowed minor A.I. to run around outside without any footwear. Officers DEXTER and SPRUILL also took photographs of the condo and of minor A.I.'s hands and feet after he was allowed to play outside the condo without any footwear.

34.  POLICE DEFENDANTS conducted a thorough search of Plaintiff's condo including examining contents of her bureau, closets, drawers and even examining personal photos albums taken from the privacy of her bureau. They examined her purse and emptied its contents and read through her mail and potentially her computer files. They opened and examined her medicine cabinet and its contents. All of this was conducted without a search warrant, court order or probable cause and was not directed towards the safety of minor A.I.

35.  POLICE DEFENDANTS' search took more than two hours. During this time they never made any effort to request a search warrant or to get a court order prior to seizing and detaining minor A.I. from his home.

36.  Neighbor LISA GORDON implored the POLICE DEFENDANTS to leave the child with her until his mother returns, but they informed her that that was not how they do things.

37.  In his police report, Officer DEXTER made exaggerated and false remarks about the state of the condo and the cleanliness of minor A.I. Officer DEXTER also made false statements regarding alleged remarks made by minor A.I. when questioned, although the minor was too young at the time to speak or answer questions and could not possibly have made the statements alleged by DEXTER.

38.  Among the outrageous and unfounded lies that DEXTER stated in his report, was an alleged statement by minor A.I. that the minor picked up a lighter and lit it and said his "mommy" taught him how to do that! A.I. barely spoke any English; had never touched a lighter before in his life,

nor ever had access to one; certainly never used the word: "mommy" (A.I. calls Plaintiff: "Mama"), nor could he form a sentence in English having been raised in an Arabic-speaking home. The lie was so blatant, that none of the SOCIAL WORKER DEFENDANTS, or their counsel, nor any expert assigned to review these documents, nor the Court, ever acknowledged any concern that such a statement was ever made by A.I. Despite this evidence that DEXTER is capable of perjury and fabrication, the Court, like others, chose to accept other parts of DEXTER's report as true, despite the lack of any supporting evidence other than DEXTER's own statements in his report. Whenever Plaintiff tried to explain the exaggerations made by DEXTER, she was criticized as "minimizing" the dangers of the home and of being "argumentative" – either considered sufficient for the OCSSA to continue the detention of A.I.

39. Officers DEXTER and SPRUILL questioned neighbors KENNETH and LISA GORDON about Plaintiff and her son and included their responses, allegations and hearsay statements in the report most of which were malicious and unfounded.

40. POLICE DEFENDANTS then took and placed A.I. with the OCSSA, where he was placed at the Orangewood Children's Home.

41. On December 7, 2005, Defendant LAURA TAYLOR filed a juvenile dependency petition pursuant to California Welfare and Institutions Code (WIC) section 300. Therein, Defendant TAYLOR made false and exaggerated allegations regarding Plaintiff's ability to supervise, protect and care for her own child, and made such accusations without any articulable evidence giving rise to a reasonable suspicion that the minor A.I. was in danger of any form of abuse or neglect.

42. In her report dated December 8, 2005, Defendant TAYLOR made the following falsified statement under "REASONABLE EFFORTS AND/OR PRIOR INTERVENTION/SERVICES OFFERED": "Under the circumstances, reasonable efforts were made to prevent or eliminate the need for the child's removal from the home". She did not describe what those efforts were, nor did she disclose the fact that by that date, Plaintiff had already negated the reasons behind the initial detention of her son. Furthermore, Defendant TAYLOR never met with Plaintiff, or inspected Plaintiff's home, nor made any offer of services to prevent the continued detention of

the minor in violation of California dependency laws requiring that efforts be made to prevent the removal or continued detention of a minor child.

43. Although no attempt had been made to visit Plaintiff's home after the removal of A.I., and although Plaintiff had already corrected the cause of the initial detention (caretaker absence), by getting permission to work from home effective December 6, 2005, this information was not reflected in Defendant TAYLOR's report.

44. On December 8, 2005, a detention hearing was held, where Plaintiff met for the first time her public defender, and read for the first time the petition filed against her, including the police report and Defendant TAYLOR's report. At this hearing, Plaintiff was not given an opportunity to testify or interrogate witnesses. A contested hearing was set for December 29, 2005.

45. At the aforementioned hearing, Commissioner Gary Vincent ruled that efforts had been made to prevent the continued detention of the minor. No effort by Defendant OCSSA and SOCIAL WORKER DEFENDANTS whatsoever had been made as required by California law.

46. On or around December 10, 2005, Defendant MERVIILUS was assigned to this case as the investigating social worker.

47. On December 14, 2005, Defendant MERVILUS visited the home of Plaintiff NIVEEN.

48. MERVILUS demanded personal information including social security numbers, driver license number and personal information from Plaintiff NIVEEN regarding her family overseas and the place of birth of Plaintiff NIVEEN. Plaintiff NIVEEN answered all relevant questions but stopped short of disclosing information on her country of origin giving a vague comment referring to the Middle East. Plaintiff was in fear of discrimination based on her religious and ethnic background and could not see any possible relevance of the information in determining the safety of minor A.I.

49. MERVIILUS also presented numerous documents for Plaintiff NIVEEN to sign. Feeling pressured to comply with her demands; Plaintiff signed all paperwork without reading them. MERVILUS later informed Plaintiff that she was considering a CRISP (Conditional Release Intensive Supervision Program).

---

50. On or around December 21, 2005, MERVIILUS unexpectedly arrived at a visit between Plaintiff and her son at the Eckhoff center (OCSSA offices) and presented Plaintiff with more papers to sign. Plaintiff requested time to present these papers to her court-appointed attorney, but MERVILUS immediately became standoffish and arrogant and withdrew her offer. Plaintiff never saw or heard from MERVILUS again until the January 3, 2006 hearing.

51. On January 3, 2006, hours before the Jurisdictional and Dispositional hearing (continued from December 29, 2005), Plaintiff and her counsel, for the first time received MERVILUS's report.

52. MERVILUS's report dated December 29, 2005, was fabricated, exaggerated and misstated the facts and the evidence. For example, MERVILUS claimed that when she visited Plaintiff's bedroom she observed the window to be open (which was indeed open *at that time*), however, MERVIILUS claimed that Plaintiff informed her that the window was left open most of the time and was open on the day the child was detained by the police officers. The police report clearly negates the allegation that the window was open and therefore that the child could somehow have climbed out of the window. MERVILUS intentionally misstated comments made by Plaintiff in order to influence the court's decision to detain the child. Even though this issue was later clarified in court, over the course of the lengthy dependency proceedings, as new court officers were assigned to the case and new case workers as well as new therapists, this falsified statement regarding an open window continued to arise, creating further unwarranted negativity towards Plaintiff and making it even harder for Plaintiff to regain custody of her child.

53. MERVILUS's report was malicious and falsified and excluded vital exculpatory information that would have aided in the return of minor A.I. following the court hearing. Further, acting as a self-appointed medical expert and without consulting with one, MERVILUS made assessments that Plaintiff exhibits symptoms of mental illness. Fortunately, the record later showed that Plaintiff does not suffer from any mental illnesses as evidenced by an Evidence Code section 730 Evaluation. MERVILUS's reports were so askew and unfounded as to include a malicious and ridiculous claim that Plaintiff and her son suffer from an untreated skin condition! She also made false claims that Plaintiff walked on her tiptoes! These ridiculous and malicious allegations were never brought up again by anyone because they were clearly outrageous and untrue,

---

COMPLAINT                                                                    8

however, they were nevertheless damaging by creating further doubt about Plaintiff's ability to

adequately care for her child. MERVILUS's reports were in fact intentionally defamatory and

unfounded and intended to influence the court to continue the detention of the child.

54. MERVILUS's report showed an uneducated, narrow-minded viewpoint by criticizing Plaintiff's

possession of her son's infant toys and belongings, making unfounded claims that Plaintiff

"hoards" things and is therefore mentally ill.

55. MERVILUS's report and testimony alleged that Plaintiff NIVEEN was being secretive in

providing information and implied that there must be a nefarious reason behind it that needs to

be investigated prior to returning the minor.

56. Although MERVILUS had offered Plaintiff a CRISP (Conditional Release Intensive Supervision

Program), she testified that she had withdrawn that offer without giving any articulable reason

behind her decision to do so.

57. In preparation for the aforementioned hearing, Plaintiff's counsel neglected to subpoena

witnesses based on his belief that MERVILUS was offering the return of the minor under a

CRISP. As a consequence, Plaintiff was denied an opportunity to confront and question

witnesses regarding hearsay information admitted by and through the OCSSA's reports,

including Defendant DEXTER's misstated and embellished police report and TAYLOR's false

allegations and statements. Only MERVILUS was available to testify.

58. At the aforementioned Jurisdictional and Dispositional hearing, MERVILUS testified that she

had not attempted to contact the minor's preschool to confirm minor's enrollment and to verify

Plaintiff's statements regarding his attendance, nor had she attempted to verify Plaintiff's

employment information, and that she had only made one or two unsuccessful attempts to reach

the alleged father by phone.

59. MERVILUS's report and testimony were in fact a complete distortion of the truth and did not

reflect the cooperation and changes Plaintiff NIVEEN had made during that short period of time

between the detention and the Dispositional hearing. Further, MERVILUS herself had observed

the misery and trauma that minor A.I. was experiencing as a result of his removal from his home

1   and his mother, and never expressed or mentioned the negative effects the continued detention

2   had on the minor to the Court.

3   60.   As a consequence of MERVILUS's actions and lack thereof, Commissioner Vincent continued

4         the out-of-home placement of minor A.I. despite the fact that the initial causes of the detention

5         had been negated.

6   61.   Plaintiff NIVEEN did everything that was required of her to regain custody of her son A.I. and

7         yet the COUNTY and its entity OCSSA maliciously maintained custody of the minor child.

8   62.   Defendant OCSSA and Defendant MERVILUS made no attempt to provide reasonable services

9         during the one month period prior to the Jurisdictional and Dispositional hearing that could have

10        prevented the need for the continued detention of the minor in direct violation of California

11        Welfare and Institution Code (WIC) section 361(d) (before a child may be removed from his

12        home, reasonable efforts to prevent removal must be made).

13  63.   Defendant MARY MADISON was assigned to Plaintiff's case on or around January 20, 2006.

14  64.   Despite a recommendation from the 730 Evaluator that Plaintiff and her son maintain daily

15        contact, Plaintiff was only given about one and one-half hours of monitored visitation twice a

16        week at the OCSSA Eckhoff center. Plaintiff was not allowed to speak with her son in his native

17        language, make any promises to him, or discuss the case with him, all in violation of Plaintiff's

18        First Amendment rights.

19  65.   At the interim review hearing in March 2006, Plaintiff's request to the Court to increase visits

20        was granted. However, visits were only increased to six hours a week and remained monitored.

21        The Court and OCSSA also agreed to allow Plaintiff to select and pay for her own therapist.

22        When the Court opened up the subject of finances, county counsel immediately interjected,

23        stating that Plaintiff has the means to pay for her own therapist.

24  66.   In June 2006, Plaintiff switched from Ms. Diane Callahan, MSW Clinical Psychology, whom

25        she had started seeing in January 2006 as part of her case plan, to Dr. Leslie Drozd, Ph.D.

26        Clinical Psychology with more than 25 years of experience in the field of clinical psychology,

27        forensic psychology, and child custody evaluations.

28

67.   On or around May 3, 2006, Plaintiff NIVEEN moved to 119 Promontory Dr W, Newport Beach, California, 92660.

68.   Plaintiff made repeated requests that Defendant MADISON visit her home and amend her reports regarding the cleanliness and suitability of her home. However, Defendant MADISON failed to respond and did not, at that time, or for some time thereafter, visit Plaintiff's new home.

69.   Only after Plaintiff's counsel, on or around June 6, 2006, requested and was granted a court order requiring Defendant MADISON to visit the home of Plaintiff NIVEEN, did she in fact schedule and complete such a visit.

70.   On June 28, 2006, MADISOIN visited Plaintiff's home and was verbally and clearly impressed with Plaintiff's home. Despite that, MADISON continued to recommend both monitored visits at the Eckhoff center as well as the continued detention of minor A.I. until the twelve months review hearing scheduled on or around December 6, 2006.

71.   After his initial detention at the Orangewood Children's Home, minor A.I. was placed in a temporary foster home until on or around January 6, 2006, whereupon he was moved to the home of Mary Martinez and remained there until around March 6, 2006. During this brief period, minor A.I. was hurt in the home of Mary Martinez and sustained a large gash across his face from his eyebrow to his chin. Further, the examining doctor detected finger-like bruise marks under his chin. The police and OCSSA conducted an investigation. On or around March 6, 2006, MADISON moved minor A.I. to the home of MICHAEL and SHELBY FORD without informing Plaintiff NIVEEN until after the minor had been moved.

72.   During the months of January through February 2006, Plaintiff expressed her desire to have her son placed in the home of a friend and neighbor. Defendant MADISON erroneously informed plaintiff that it is not the policy of OCSSA to move children once placed in a suitable home. However, in March 2006, Defendant MADISON, nevertheless, moved the minor without any prior consent from Plaintiff and without informing her that she was going to do so.

73.   At a later date, Plaintiff was informed, and on that basis alleges, that the home of Defendants FORD is a fost-adopt home (a foster home licensed simply for the purpose of adopting a child), and that Defendants FORD were only interested in adopting a child by participating in this

COMPLAINT                                        11

program. Further, Plaintiff also learned that Defendants FORD were allowed to take minor A.I. home on a few occasions prior to taking custody of him, in order to "try him out" as a possible fit.

74. A bonding study conducted in December 2007 revealed that Defendants FORD, right after the birth of their first child in the mid-1990's, had decided to adopt their next child.

75. Plaintiff believes, and on that basis alleges, that Defendants FORD made clear to SOCIAL WORKER DEFENDANTS that they were very interested in adopting the minor due to his good looks, outgoing behavior and endearing personality (as described by Defendant BRODKIN).

76. Plaintiff believes, and on that basis alleges, that a conspiracy (whether articulated or unspoken) evolved from this understanding, whereby, SOCIAL WORKER DEFENDANTS would make every effort to stall the reunification, nitpick at, and criticize Plaintiff whenever possible, side with the Defendants FORD over Plaintiff, skew their reports to convince the court that the visits have a negative effect on the minor as reported by Defendants FORD, recommend reduced phone calls and visits on that basis alone and per the requests of Defendants FORD, and continue to recommend the termination of Plaintiff's rights and the adoption of her son by Defendants FORD.

77. Plaintiff is informed, and on that basis alleges, that she had never been informed of, and thereby was excluded from, a Team Decision Meeting (TDM) on March 8, 2006, to discuss the future of her son, when she should in fact have been the main participant. The purpose of the TDM is "to involve the parents/Resource Family and other interested parties in discussing concerns that have arisen that may cause a placement disruption." (Source: MADISON's March 2006 report.)

78. In her court report, dated March 14, 2006, MADISON disclosed verbatim, without consent or court order, the contents of the confidential EC 730 Evaluation despite the clearly stated privileged and confidential nature of this report, which is intended for the Court. As a consequence of this unauthorized disclosure, the contents of the EC 730 Evaluation were made available to an undisclosed number of social workers, including but not limited to, every caseworker, monitor, supervisor, attorney and others who had access to this case.

79.    Also in March 2006, Defendant MADISON transmitted the confidential EC 730 Evaluation,
       again without consent or court order, to Diane Callahan, Plaintiff's therapist. Earlier, MADISON
       had faxed a copy of the exaggerated and fabricated HBPD police report, photos taken by the
       HBPD, and Defendant TAYLOR's inaccurate report to both the EC 730 Evaluator prior to
       completion of his evaluation thereby tainting the results of the evaluation, as well as to Ms.
       Callahan, also without court order or consent.

80.    Plaintiff believes, and on that basis alleges, that the EC 730 Evaluation caused Ms. Callahan to
       provide opinions that were influenced by the contents of the aforementioned Evaluation and
       were not based on her own personal observations or expertise.

81.    Plaintiff is informed, and on that basis alleges, that the confidential EC 730 Evaluation which
       clearly stated that it was intended for the Court only, was made available to County Counsel,
       Minor's Counsel and SOCIAL WORKER DEFENDANTS without Plaintiff's consent.

82.    Plaintiff is informed, and on that basis alleges, that Defendant JULIE FULKERSON, the
       adoptions social worker assigned after July 17, 2008 to this case, had access to the confidential
       EC 730 Evaluation. Further, Plaintiff is informed and alleges, that on December 3, 2009,
       Defendant FULKERSON faxed a copy of this EC 730 confidential Forensic Psychological
       Evaluation, without a court order or consent by Plaintiff, to Detective PENNY FREEMAN of the
       Newport Beach Police Department, who in turn transmitted this confidential report without court
       order or authorization to someone in the Orange County District Attorney's office, who, in turn,
       in or around February 2010, submitted a copy to Plaintiff's counsel of record, thereby disclosing
       privileged confidential medical and mental health information, to an, as of yet, unknown number
       of people, in violation of Plaintiff's Fourteenth Amendment constitutional rights to privacy, and
       other applicable state, federal, and case law, including, but not limited to, the Confidentiality of
       Medical Information Act, California Civil Code section 56.36.

83.    Along with the EC 730 Evaluation, Defendant FULKERSON also faxed the HBPD report from
       December 5, 2005, along with confidential social worker reports and investigations conducted in
       relation to the dependency proceedings, and confidential child abuse and neglect reports and

1    investigations made against Defendants FORD, all without court order, consent, or other

2    authorization.

3    84.    Throughout her appointment as case worker from January 2006 until September 2006,

4    Defendant MADISON continued to make malicious and unwarranted remarks about Plaintiff's

5    parenting style without any consideration for Plaintiff's rights to parent her child using her own

6    parenting style as long as the form and style of parenting does not place the child's life at risk.

7    85.    Plaintiff is informed by her therapists, and on that basis alleges, that Defendant MADISON made

8    gross misstatements in her reports regarding verbal conversations with Plaintiff's therapists,

9    either by taking the statements out of context, or by not explaining when these statements were

10    made, or by twisting the words to create a negative impression of Plaintiff.

11    86.    Because of the unexpected, malicious and fabricated nature of MADISON's reports, and due to

12    lack of timely discovery, Plaintiff's counsel continued the June 6, 2006, six months review

13    hearing until September 2006. The decision to continue the case was also influenced by the wild

14    and false allegations made by monitor WELLBORN employee of NEW ALTERNATIVES.

15    87.    From January 2006 until September 2006, Defendant MADISON presented and continued to

16    present biased, misstated, inaccurate and fabricated and false allegations in her reports and court

17    documents. Furthermore, none of these reports were available to Plaintiff or her counsel until the

18    day of the scheduled hearing. Plaintiff and her counsel were therefore unable to prepare a proper

19    defense in particular with regards to outrageous false allegations made by Defendant

20    WELLBORN, an employee of Defendant NEW ALTERNATIVES, which were included in

21    MADISON's reports. The lies presented by WELLBORN and Defendant MADISON were so

22    outrageous and unfounded, that on or around June 4, 2006, Plaintiff NIVEEN was forced to

23    bring a friend, Holly Guirguis, with a video camera to the visits in order to prove that Defendant

24    WELLBORN was indeed fabricating outrageous lies. Instead of acknowledging or investigating

25    Plaintiff's concerns about this monitor, Defendant MADISON continued to include derogatory

26    remarks made by WELLBORN, which were redirected to include Ms. Guirguis as well, wherein

27    she falsely and maliciously described Plaintiff's friend as "interfering" in the visit and being

28    "disruptive". Ms. Guirguis is in fact a professional civil engineer with a graduate degree, and the

videotape of this visit, as well as other videotaped visits during 2007, show that Ms. Guirguis was anything but "combative", "interfering", or "disruptive". Despite repeated complaints by Plaintiff, MADISON neglected to investigate the claims, although she did verbally acknowledge that when she monitored the visits herself, they were problem-free. However, she continued to include WELLBORN's false allegations in her reports.

88. Plaintiff complained to Defendant NEW ALTERNATIVE's Director CHARLOTTE ANDERSON regarding allowing WELLBORN to make false and malicious statements. ANDERSON defended WELLBORN's actions, and made derogatory remarks that "parents make all kinds of false complaints" and made no indication that she would investigate the matter.

89. Following the aforementioned visit where Plaintiff's friend attended a visit at the Eckhoff center, Defendant MADISION made false claims that it was not the policy of OCSSA to allow non-parent visitors to be present during the visits. This is in fact not true. As a result, Plaintiff was not allowed to bring a witness to the visits with the exception of that one time, until MADISON retired from the OCSSA in September 2006.

90. Plaintiff is convinced and alleges that MADISON's refusal to allow a third party to be present at visits was motivated by her desire to admit derogatory and falsified statements made by Defendant WELLBORN and other monitors in her court reports.

91. At the six months review hearing in September 2006, Defendant MADISON again submitted fabricated, misstated and biased reports wherein her recommendations remained the same: that the child remain in foster care and that visitations continue to be monitored at the Eckhoff center.

92. In her testimony, Defendant MADISON was unable to articulate any reason why the child's safety would be at risk if he were returned to the care and custody of his mother. Nor was Defendant MADISON able to articulate any meaningful reason why visits should not be liberalized and/or increased considering the significant bond between the minor and his mother. In fact, an Evidence Code section 730 evaluation recommended daily contact between Plaintiff and her son A.I. Despite this recommendation, Defendant MADISON continued to allow Plaintiff only twice a week visits with her son.

93. After the hearing, Commissioner Vincent, based on Defendant MADISON's recommendations continued the detention of minor A.I. in foster care. Commissioner Vincent made specific remarks that he was concerned about the allegations made in Defendant MADISON's report, although Plaintiff had testified that they were untrue.

94. Commissioner Vincent, however, requested increased and liberalized visitation for Plaintiff.

95. Despite, the Court's order to liberalize visitation, stating that the child would be safe with Plaintiff, MADISON only removed the restriction requiring Plaintiff's visits with her son to occur at the Eckhoff center. Visits continued to be supervised, however. Visits were only increased to approximately six hours a week.

96. From July 2006 until September 2006, MADISON never visited Plaintiff's home again to inspect its readiness for the return of the minor, nor did she authorize any home visits for the minor.

97. Within about a week or two of the conclusion of the September 2006 hearing, MADISON retired and was replaced by Defendant COLLEEN VARGAS.

98. VARGAS was assigned to the case for only about a month, and never asked to visit nor attempted to visit Plaintiff's home nor did she attend any of Plaintiff's visits with her son.

99. Defendant VARGAS made malicious, unfounded and derogatory remarks about Plaintiff and refused to lift the monitoring or increase visitation. Further, Defendant VARGAS continued to make derisive remarks about Plaintiff's parenting style unwilling to accept the fact that different parents have different parenting styles depending on their culture and heritage.

100. Defendant VARGAS in collusion with Defendants FORD made false allegations that the visits were making the child more aggressive, clingy and tired.

101. Throughout the dependency case, Defendants FORD made several attempts to reduce visitation and phone calls alleging that they were not necessary or that they had a negative effect on the child. Defendants VARGAS, WREN and BRODKIN were constantly supportive of Defendants FORD, despite the lack of any evidence supporting Defendants FORD's claims, and their reports were maliciously fabricated and biased towards Defendants FORD and against Plaintiff.

102. On or around September 28, 2006, Plaintiff requested increased visits. Defendant VARGAS refused alleging that the child was overwhelmed on the visits as they were.

103. Defendant VARGAS maliciously accused Plaintiff of wanting to sabotage the placement simply because Plaintiff continued to request, as she had been requesting since February 2006, that her son be placed with friend and ex-neighbor Holly Guirguis who shares the same racial and cultural background, and who would ensure that the minor received appropriate language and religious training, as well as facilitate and monitor the visits between her and the minor which at the present time had to go through a monitoring service or through OCSSA.

104. Plaintiff is aware, and on that basis alleges, that Defendants FORD in collusion with SOCIAL WORKERS DEFENDANTS, in particular Defendants: MADISON, VARGAS, WREN and BRODKIN, conspired to sabotage the reunification process in order to adopt her son.

105. On or around October 14, 2006, a third social worker, Defendant RHEA WREN, was assigned to this case.

106. On her very first visit to Defendants FORD's home, on or around October 18, 2006, Defendant WREN agreed to reduce phone calls with Plaintiff without a court order, solely based on Defendants FORD's claims that the phone calls were not necessary or an inconvenience at times.

107. In late November 2006, WREN and another unknown social worker arrived for a visit at Plaintiff's home. After much discussion, WREN and the other social worker left the premises. Approximately half an hour later, they both returned unannounced to the residence of Plaintiff NIVEEN. Plaintiff invited them in and after another lengthy discussion; Plaintiff became aware that the reason behind this second unexpected visit was related to the extremely positive impression that Plaintiff's home had made on the social workers. At this late evening meeting, Plaintiff presented all documents requested by Defendant WREN, including, but not limited to, her bank account showing reserves sufficient to sustain her and her son for several months; pay stubs from her work; a receipt for her T.V. (the reason behind this request is unknown, except that Plaintiff was informed that WREN wanted to make sure that Plaintiff was able to pay for all her purchases!); and a copy of her rental agreement.

108. When Plaintiff objected to disclosing private bank account information, and her clients' names, WREN informed Plaintiff that when CPS (OCSSA) became involved in her life, she, Plaintiff, was no longer entitled to any privacy. WREN was also referring to Plaintiff's family overseas who were neither citizens of, nor residents of, the United States. Plaintiff did fully comply with all WREN's requests, however, she never disclosed the physical addresses of her relatives and family members overseas because she was never directly asked to, nor did she believe it to be relevant.

109. Approximately a week after this visit, Defendant WREN made a recommendation to terminate Plaintiff's parental rights and place the child into adoption. This recommendation was made despite Plaintiff having fully complied with her case plan, and despite a favorable report from her therapist Dr. Drozd, and despite providing all relevant information to Defendant WREN, and finally, despite the positive impression Plaintiff's home had made on WREN. When asked why she had made this unexpected recommendation, WREN replied: "I can't explain my job to you."

110. When Plaintiff objected to WREN's unexpected decision to terminate parental rights, pointing to Dr. Drozd's favorable reports, WREN responded by alleging that, because Plaintiff was paying for Dr. Drozd's services, then Dr. Drozd would be expected to give Plaintiff a favorable report.

111. Plaintiff retained new counsel around October 17, 2006 and under the direction of said counsel the twelve months hearing was continued from around December 6, 2006 until January 25, 2007.

112. At the scheduled January 2007 twelve months hearing, Plaintiff's counsel along with Defendant WREN, county counsel and minor counsel, conducted a hearing off-the-record behind closed doors in chambers with Commissioner Vincent, while Plaintiff and her witnesses waited outside.

113. Pending this lengthy discussion, Plaintiff was informed by her counsel that he agreed to combine the twelve months hearing with the eighteen months hearing to occur on or around June 6, 2007. Plaintiff was too uninformed in the law to realize the detriments of said decision to continue the case without a trial. A hearing was set for February 7, 2007 to appoint a new therapist per the requests of Defendants WREN and OCSSA (see next point).

114. During this aforementioned closed meeting and in her report, Defendant WREN made false and malicious allegations that because Plaintiff was paying for her own therapist, then said therapist

(referring to Dr. Drozd) would be biased in favor of Plaintiff. Based on that allegation alone, Defendant WREN convinced the court to order a new court appointed therapist to be assigned to Plaintiff's case and that Plaintiff start therapy all over again with this new therapist.

115.   The court accepted and ordered the recommendations of Defendant WREN, by a) continuing the detention of minor A.I. outside his home; b) ordering that a new court-assigned therapist be assigned to Plaintiff; and c) that Plaintiff be required to complete yet more parenting classes with Defendant NEW ALTERNATIVES, the employers of the aforementioned WELLBORN. Further, the court continued the statutorily required twelve months contested hearing.

116.   On February 7, 2007, in response to OCSSA's decision to replace Dr. Drozd based on the fact that Plaintiff was paying for her, Dr. Drozd sent an email to Plaintiff's counsel, denouncing this decision. In her email she stated that: "I candidly find this as more than irrational at best and a demonstration of someone's ignorance of the importance of a therapeutic relationship. It also shows someone's all or nothing thinking and prejudiced views about a class of people. Instead of that class being all people who are X color or Y race or from Z part of the world or all those who have done ABC in the past are not good people, this is simply a new twist on it, one I wouldn't expect from other professionals. Does County Counsel really believe that all psychologists or mental health professionals are the same -- biased and prejudiced and inexperienced and don't understand the line between clinical and forensic work?"

117.   On or around February 9, 2007, the Court appointed Dr. Patricia Yglesias who also serves on the juvenile court panel.

118.   Plaintiff believes, and on that basis alleges, that said off-the-record conference was conducted without her consent and did not comply with California statutory laws, evidence codes and other case law.

119.   Plaintiff believes, and on that basis alleges, that the decision to replace Dr. Drozd with another therapist was nothing more than an attempt to stall the reunification process in order to nitpick at Plaintiff in the hopes of finding some fault, while alienating her child from her and weakening the otherwise strong bond between them, as her allowed time for reunification gradually expired.

120. Plaintiff is convinced, and on that basis alleges, that the denial of her rights to the twelve months hearing which is a critical part of the dependency proceedings in ensuring fair and periodic review (see *Cynthia D. v. Superior Court*, 5 Cal.4th 242), was a violation of her Procedural and Substantive Due Process Constitutional Rights under the Fourteenth Amendment and was a major contributor to the ultimate termination of her reunification services under the preponderance of the evidence and the termination of her parental rights without any further proof of parental unfitness.

121. The combined twelve-eighteen months hearing was scheduled for May 2007, but was continued several times against Plaintiff's wishes until October 2007.

122. From January 2007 through approximately April 2007, Plaintiff made several complaints against WREN to her supervisor.

123. Plaintiff believes, and on that basis alleges, that WREN was being evasive in her reasoning behind refusing to liberalize Plaintiff's visits, allow overnight visits or increase visits; that WREN had already made up her mind to terminate Plaintiff's parental rights and was unwilling to aid her in the reunification process by liberalizing visits, and by making appropriate and fair assessments and recommendations; and that WREN was unwilling to acknowledge that Plaintiff has the constitutional right to implement her own parenting style without undue influence or pressure by the government.

124. Furthermore, Plaintiff believes, and on that basis alleges, that WREN was fabricating statements including but not limited to, outrageous and unfounded allegations that if Plaintiff was permitted unmonitored visitation then she, Plaintiff, might flee with her son, solely based on the fact that Plaintiff had family in the Middle East.

125. Plaintiff believes, and on that basis alleges, that Defendant WREN's beliefs that Plaintiff's Middle Eastern background was a sufficient cause for concern that Plaintiff would engage in illegal activity, were racist and discriminatory and prevented Plaintiff from demonstrating to the Court that she was indeed able to safely care for her son as she had done for the first three and one-half years of his life.

126. Plaintiff believes, and on that basis alleges, that Defendant WREN refused to lift the monitoring to prevent Plaintiff from demonstrating her ability to safely care for her child in preparation for his gradual return as is often the case in these dependency proceedings, and is often a prerequisite prior to attaining full custody.

127. Plaintiff believes, and on that basis alleges, that Defendant WREN also refused to lift the monitoring in the hopes of continuing to find fault with Plaintiff's parenting skills and to make further unfounded and extravagant allegations.

128. Defendant WREN continued to interrogate and obsess over Plaintiff's initial alleged secretiveness about not disclosing detailed information about her family in Egypt, dating back to her December 2005 interview with MERVILUS, although Plaintiff had answered these questions since then. Defendant WREN also continued to use old allegations from prior social worker reports as a reason to deny Plaintiff her right to increased visitation and unmonitored visits.

129. During a phone call between Plaintiff and WREN, Plaintiff threatened to sue WREN and the OCSSA for not facilitating the reunification process by lifting the monitoring or allowing conjoint therapy with her son. During another call, Plaintiff accused WREN of wanting to adopt out her son for federal funds. Once or twice, after fruitless arguments regarding lifting the monitoring, allowing overnight visits, etc, either Plaintiff and/or WREN would hang up the phone on the other.

130. Another point of contention was Defendant WREN's continual denial of any order by the court that the visits be liberalized, instead alleging that there was a court order that visits be monitored.

131. Plaintiff is informed, and on that basis alleges, that there never existed a Court order that the visits remain monitored as is evidenced by the reporter's transcripts. To the contrary, at the January 2007 hearing, Commissioner Vincent expressed his desire to see Plaintiff and her son reunified prior to his upcoming retirement and vested the liberalizing of visits to the discretion of the OCSSA. In fact, Plaintiff is informed and alleges, that Commissioner Vincent threatened to lift the monitoring himself if OCSSA did not.

132. In or around March 2007, Commissioner Gary Vincent retired from the Orange County Superior Court. No explanation was given behind this retirement. From this point forward, the case was assigned to Judge James P. Marion.

133. On or around April 2007, as a result of Plaintiff's complaints against WREN and the continuous friction between her and Defendant WREN, a new social worker, Defendant STEVE BRODKIN was assigned to the case.

134. Defendant BRODKIN never once offered to visit Plaintiff's home, increase visitation, attend visitation between her and her son nor even attempt to speak with Plaintiff's parenting coach, Ms. Valorie Christopherson, a retired deputy with her own monitoring company whom Plaintiff had retained from November 2006 onwards to attend visits with her and her son and provide unbiased independent feedback to the court through the OCSSA agency and its social workers.

135. BRODKIN finally visited Plaintiff's home in June 2007 just prior to the scheduled eighteen months review hearing. That was the one and only time that BRODKIN visited Plaintiff's home and the only time that he observed her and her son A.I. together (for about 5-10 minutes).

136. Although BRODKIN had nothing negative to say about Plaintiff's home, Plaintiff's compliance with the case plan, or her visits, he nevertheless refused to lift the monitoring claiming that Defendant WREN had informed him that the visits needed to remain monitored per a minute order by the Court.

137. Plaintiff complained to BRODKIN's supervisor, Defendant DANG VU about this false allegation. VU concurred with BRODKIN although he acknowledged that social services has the authority to lift the monitoring or file a petition to do so, however, no such attempt was made.

138. Plaintiff again realleges that no such order exists or ever existed. In fact, the record shows that at a July 12, 2007 hearing, Plaintiff's counsel clarified this point with newly appointed Justice Marion, and the Court's response was that it does not have a problem with OCSSA lifting the monitoring at their discretion.

139. From December 5, 2005 until the eighteen months review hearing in October 2007 and beyond, Plaintiff was forced to endure monitored visitation twice a week where she could neither speak to her son in private nor even take him to the bathroom alone.

140. From late 2006 until around February or March 2007, Defendant WREN assigned social worker PAMELA PANTIRU to monitor Plaintiff's visits.

141. In her reports, Defendant PANTIRU made malicious, deceitful and unwarranted remarks about Plaintiff including actually going to the extent of describing the way the cushions were lined up on her sofa as if it were an aberration, when in fact that is the way the sofa sectional was designed.

142. Plaintiff believes, and on that basis alleges, that Defendant PANTIRU deliberately omitted exculpatory information and fabricated statements with the intent to deprive Plaintiff of her parental rights.

143. On or around January 2007, Defendant WREN assigned social worker MARGARET JORTH as a monitor to Plaintiff's case.

144. Defendant JORTH continually expressed and made negative and unwarranted statements about Plaintiff's judgment and parental skills. JORTH knew that Plaintiff's cultural, ethnic and religious background is different than hers and that Plaintiff was implementing the parenting style appropriate in her culture and race. Despite that, JORTH continued to make derogatory remarks regarding Plaintiff's appearance, clothing, mannerism, demeanor, and parenting style.

145. Defendant JORTH made numerous malicious statements about Plaintiff's judgment and parenting skills based on the following meaningless and irrelevant allegations:

- Plaintiff does not carry a purse;
- Plaintiff's clothes sometimes have tears in them including her jeans;
- Plaintiff is dressed in too warm clothing for the weather;
- Plaintiff asked her son to carry a $20 bill in his pocket for her;
- Plaintiff did not pre-assemble a telescope she had purchased for her son prior to their visit;
- Plaintiff fed her son a tuna fish sandwich while he was bowling, and the tuna fish was running on the ball return;
- Plaintiff and her son did not wash their hands prior to eating;
- Plaintiff does not enforce a policy of making her son sit down to eat meals but instead fed him a sandwich and fries while he was playing resulting in a "chaotic" visit;

- Plaintiff allowed her son to go to the bathroom in the middle of a meal, instead of making him go before the meal;
- Plaintiff made a remark that Princess Diana is dead in front of her son;
- Plaintiff's toilet had some hair in it;
- Plaintiff's toilet water was blue;
- Plaintiff did not bring suntan lotion with her for her son to a trip to Universal Studios;
- Plaintiff did not bring any water with her to the trip to Universal Studios;
- Plaintiff does not give her son time-outs;
- Plaintiff does not set expectations for her son;
- Plaintiff does not set limits, boundaries and structure for her son;
- Plaintiff allows her son to eat cookies when he refuses to eat his meals;
- Plaintiff does not offer her son small enough portions of a meal (JORTH was apparently dissatisfied that Plaintiff ordered one of the IHOP International Breakfast meals for her son instead of ordering something from the kids' menu);
- Plaintiff insists that her son try to eat shrimp;
- Plaintiff took her son to a shrimp restaurant (JORTH alleged that A.I. does not like shrimp);
- Plaintiff offers her son too many food options at mealtime;
- Plaintiff waited too long to eat lunch at a trip to Universal Studios;
- Plaintiff allowed her son to go to the men's bathroom alone (even though Plaintiff and Defendant JORTH were standing by the door the entire time and the bathroom was located in the Arcade section of a clean establishment at Dave and Busters on a mid-week afternoon). (This list is not exhaustive due to the ridiculously lengthy, continuous, petty, meaningless and intentionally malicious complaints made by Defendant JORTH against Plaintiff.)

146. Plaintiff complained to her therapists and to Defendants WREN and BRODKIN that Defendant JORTH was interfering in the visits and was manhandling the child by inappropriately pulling his arm and dragging him away when he refused to come along.

147. Neither WREN nor BRODKIN offered to replace JORTH.

148. Due to repeated complaints by Plaintiff regarding Defendant JORTH, especially post her contemptuous and malicious testimony at the October 2007 hearing, requesting that BRODKIN replace JORTH with another monitor, BRODKIN agreed to look for another monitor.

149. From October 2007 until March or April 2008, BRODKIN claimed that he had placed a request to find a new monitor but was unable to find one. Plaintiff contacted senior social worker PAUL SANCHEZ who had monitored many visits with her and her son from around March 2007 through July 2007 and who had testified favorably at the October 2007 hearing on the visits. Plaintiff asked SANCHEZ if he would consider monitoring further visits in place of JORTH. SANCHEZ contacted BRODKIN regarding assuming this role once again. BRODKIN refused to allow SANCHEZ to replace JORTH or monitor any more visits with Plaintiff and her son.

150. Plaintiff contacted and spoke with Defendant VU (BRODKIN's Supervisor) again complaining about JORTH and requesting an explanation as to why BRODKIN refused to appoint SANCHEZ, who was available and willing to monitor visits. VU merely stated: "We won't be using Paul anymore". No explanation was given, and, after speaking with SANCHEZ, Plaintiff was informed, and on that basis alleges, that there were no ongoing or past conflicts between SANCHEZ and BRODKIN or between SANCHEZ and VU, and no valid explanation for rejecting SANCHEZ other than his favorable comments about Plaintiff, whereas JORTH had been contemptuous towards Plaintiff throughout her assignment as Plaintiff's monitor.

151. On October 2007, the combined twelve-eighteen months contested review hearing was finally held. Defendants BRODKIN and JORTH testified at this hearing, as did senior social worker and monitor SANCHEZ, Plaintiff, parenting coach Valorie Christopherson, and therapists Dr. Drozd and Dr. Yglesias.

152. Defendant BRODKIN claimed that the reason he recommends termination of Plaintiff's parental rights was due to the "extremely dysfunctional behavior" of her son A.I.

153. Defendant BRODKIN's allegations were never supported by expert testimony nor were they in fact true. Defendant BRODKIN expressed his belief that that was the reason behind the removal of the minor, although it never was. Defendant BRODKIN'S allegations and testimony were

1   unfounded, uninformed, untruthful, malicious and invidious and made with willful disregard for

2   Plaintiff's and minor A.I.'s Fourteenth Amendment rights to maintain their familial relationship.

3   154.   At the aforementioned hearing, and despite repeated requests by Plaintiff, the Court refused to

4   allow Plaintiff's witnesses to testify. Plaintiff's witnesses included Holly Guirguis who had

5   witnessed and taped several visits and who was a neighbor of the Plaintiff and the minor, prior to

6   the minor's detention. The testimonies of Plaintiff's witnesses were intended to impeach the

7   testimony of Defendants BRODKIN, JORTH and other SOCIAL WORKER DEFENDANTS,

8   including reports by Defendant WELLBORN earlier in the case, as well as to impeach hearsay

9   evidence that was admitted by and through these SOCIAL WORKER DEFENDANTS' reports.

10   Further, the Court refused to view videotapes of visits between Plaintiff and her son, which were

11   also intended to impeach Defendants' allegations of inadequate parenting and/or bad judgment.

12   155.   As a result of the recommendations of Defendant BRODKIN to terminate Plaintiff's parental

13   rights, and due to derogatory remarks made by JORTH regarding Plaintiff's judgment, the Court

14   terminated Plaintiff's reunification services, despite favorable testimony by Dr. Drozd regarding

15   Plaintiff's compliance and ability to parent her child, and similar favorable testimony by

16   Christopherson regarding improvements in Plaintiff's parenting skills. In making this decision,

17   the Court sided with OCSSA, citing the Dave and Busters bathroom visit as an example of bad

18   judgment simply because that restaurant caters to adults and embodies a bar within its premises.

19   156.   The Court also ruled that reasonable services had been provided despite SOCIAL WORKER

20   DEFENDANTS' refusal to lift the monitoring, allow conjoint therapy, increase visits or perform

21   any reasonable efforts to encourage and strengthen the parental relationship. In fact, the Court

22   was aware that Plaintiff had complained that SOCIAL WORKER DEFENDANTS were

23   mischaracterizing the visits, lying and withholding favorable and exculpatory information, and

24   that she had witnesses and videotapes to impeach these Defendants. The Court was also aware

25   that the Defendants were attempting to reduce visits and phone calls and had not permitted

26   Plaintiff a visit in three weeks and that Defendant BRODKIN had not made any effort to find a

27   monitor or to replace Defendant JORTH despite her clearly contemptuous behavior towards the

28

1    Plaintiff. Finally, the Court was also aware that Plaintiff had not missed any visits, did in fact

2    share a mutual bond with minor A.I., and was fully compliant with the case plan.

3  157.  Despite all these facts, and due to the recommendations of OCSSA, the Court did in fact

4    terminate Plaintiff's reunification services and schedule a permanency hearing, Welfare and

5    Institutions Code (WIC) section 366.26, at which no further proof of parental unfitness is

6    required to terminate parental rights.

7  158.  Following the recommendation of Defendant OCSSA, the Court agreed to reduce the visits but

8    did not clarify by how much. However, the court refused to reduce the phone calls which had

9    already been reduced without court order by Defendant WREN, and which Defendant OCSSA,

10    by and through SOCIAL WORKER DEFENDANTS, in collusion with Defendants FORD, was

11    trying to eliminate completely.

12  159.  During the three-week October 2007 combined twelve-eighteen months trial, Defendants

13    BRODKIN and JORTH did not schedule any visits for Plaintiff. JORTH reported being sick due

14    to a medical treatment although she was able to appear in court to testify, and BRODKIN made

15    no efforts to replace her. By the end of the trial, OCSSA owed Plaintiff more than 18 hours of

16    make-up visits.

17  160.  In November 2007, after the termination of Plaintiff's reunification services, Plaintiff requested

18    that the court increase her visits and liberalize them and continue to allow Plaintiff the right to

19    videotape visits with her son (which up to this point she had been allowed to do), as well as to

20    continue to allow her to have her parenting coach Christopherson present (Christopherson had

21    been approved by Commissioner Vincent and OCSSA), as well as to allow her conjoint therapy

22    (which Plaintiff had been denied up to this point), and to allow her therapists to attend and

23    observe visits with her son.

24  161.  Defendant BRODKIN and Defendant OCSSA objected to the granting of these requests on the

25    grounds that the child should be preparing for the transition to adoption and based on false

26    claims that the visits were upsetting the child. Based on that, the Court refused all of Plaintiff's

27    requests, including the ongoing videotaping of visits, and disallowed any third parties to be

28

1  present at visits. Justice Marion would not even authorize conjoint therapy nor allow Dr. Drozd

2  or Dr. Yglesias to observe Plaintiff with her son.

162. In November 2007, Plaintiff approached CAIR (Counsel on American-Islamic Relations) regarding discrimination against her and her culture. She also expressed her sorrow and concern that the SOCIAL WORKER DEFENDANTS and their employer OCSSA would not place her son with a family that shares a similar cultural and religious background to Plaintiff. Plaintiff had already presented letters to BRODKIN, VU and Defendant RYAN, explaining the need for her son to maintain his cultural and religious heritage and presenting two families ready and willing to take him into their homes. One of these families is an approved foster home in Orange County and the other is an old school friend of Plaintiff with the same cultural and religious background who is a Cardiologist at Children's Hospital in USC.

163. In November and December 2007, Plaintiff also contacted Ambassador Salaheldin of Egypt in San Francisco asking for his intervention in the case. Plaintiff also contacted Defendants RYAN, HARITA, and TRICIA BUDRIS (RYAN's assistant), complaining about the prejudicial treatment she has been receiving from Defendant OCSSA, Defendant JORTH and Defendant BRODKIN. In particular, Plaintiff complained about BRODKIN's refusal to meet with her, return her calls, facilitate reunification by lifting the monitoring, replace Defendant JORTH, or move her child to an appropriate placement.

164. On or around February 1, 2008, Ambassador Salaheldin contacted Defendant MICHAEL RYAN both telephonically as well as by mail. Defendant RYAN in a letter dated February 15, 2008, informed the Ambassador that the agency is reviewing the case.

165. To Plaintiff's knowledge nothing was done by Defendants RYAN, HARITA or Defendant OCSSA to address Plaintiff's and the Ambassador's concerns.

166. Similarly, the Ambassador sent letters to both BRODKIN and the Court expressing his concerns about a) the unfair treatment that Plaintiff was getting, and b) the child's placement.

167. None of the SOCIAL WORKER DEFENDANTS attempted to address Plaintiff's concerns, not even the simple request to replace Defendant JORTH or to reprimand Defendant BRODKIN for not returning Plaintiff's phone calls, despite acknowledging that that was unacceptable behavior.

1   (Plaintiff had not met with or spoken to BRODKIN since August 15, 2007 - two months prior to

2   the termination of her reunification services - due to his unwillingness to return her calls.)

3   168.  From around October 2007 until around November 2007, Defendant MOLINA was assigned by

4   Defendant BRODKIN to monitor Plaintiff's visits.

5   169.  In his reports, Defendant MOLINA made malicious, deceitful and inaccurate statements about

6   Plaintiff's visits with her son.

7   170.  On one particular visit, around late October 2007, minor A.I. had a "melt-down" and started

8   crying when Plaintiff threatened to give him a time-out as she had consistently been instructed to

9   do by Defendants WREN, JORTH, PANTIRU and BRODKIN. Parenting coach and former

10   deputy Valorie Christopherson was present at this visit, as was Defendant MOLINA. While

11   Christopherson's report of the visit indicated that Plaintiff's setting of limits and handling of her

12   son (a major issue that had contributed to Plaintiff not being allowed unmonitored visits,

13   eventually culminating in the termination of Plaintiff's reunification services) had improved

14   significantly, MOLINA, on the other hand, presented a report that was critical and so malicious,

15   that Defendant BRODKIN, using this incident as an excuse, recommended reducing Plaintiff's

16   visits, claiming that the visits were upsetting the child! Hence, when Plaintiff was exercising

17   permissiveness and kindness she was criticized, and when she exercised her parental authority,

18   as she had been instructed to do by OCSSA, she was also criticized by the very same people, to a

19   point of actually recommending the reduction of her visits despite their awareness that the minor

20   loves Plaintiff and despite Defendant BRODKIN describing the minor's behavior as

21   dysfunctional and his awareness that the minor acts out with other adults and is undergoing

22   behavioral therapy.

23   171.  Plaintiff is informed, and on that basis alleges, that MOLINA and BRODKIN excluded

24   exculpatory information from the Court regarding Plaintiff's adequate handling of the situation

25   as described in Christopherson's report: that the minor calmed down, while Plaintiff held him

26   strongly in her arms and kissed him; that the minor behaved himself much better during the

27   remainder of the visit; and that right after his crying fit, minor A.I. was clinging to Plaintiff and

28   wanted her to carry him and that they had a wonderful visit afterwards as always. MOLINA and

COMPLAINT                                                    29

1    BRODKIN's report might as well have been describing an entirely different visit, for all its

2    fairness and truthfulness, as much of SOCIAL WORKER DEFENDANTS' reports had been for

3    the entire period that Plaintiff and her son were trapped in this System.

4  172.  Plaintiff believes, and on that basis alleges, that Defendants MOLINA in collusion with

5    BRODKIN deliberately omitted exculpatory information and made false and malicious

6    statements with the intent to deprive Plaintiff of her parental rights.

7  173.  Earlier at this same visit, Plaintiff's friend Holly Guirguis was also present, and MOLINA

8    threatened to terminate the visit (as he had often unjustly threatened to do whenever A.I. acted

9    out) simply because Plaintiff and her friend exercised their First Amendment Constitutional

10    rights to speak to each other in a foreign language that neither MOLINA nor the child could

11    understand. In fact, A.I. was not even within hearing distance when Ms. Guirguis spoke to

12    Plaintiff briefly in a foreign language.

13  174.  Following this visit, Defendant BRODKIN succeeded in convincing the Court to a) reduce visits;

14    b) disallow third parties to be present at the visits, including long-time parenting coach

15    Christopherson, as well as Plaintiff's therapists, and all of Plaintiff's friends and neighbors; and

16    c) disallow any further videotaping of the visits, as explained in paragraph 161 above, by falsely

17    claiming that the visits were upsetting the child and the presence of third parties, including the

18    Court- and OCSSA-approved parenting coach Christopherson, was interfering with the visits.

19  175.  Plaintiff is informed, and on that basis alleges, that these requests were maliciously intended to

20    deprive Plaintiff of witnesses to the visits which were being consistently misreported by

21    SOCIAL WORKERS DEFENDANTS and to alienate her son's affection and weaken the bond

22    between her and her child in order to pave the way to the termination of her parental rights under

23    the guise of the "best interest of the child", as was indeed the case at the parental rights

24    termination (WIC section 366.26) hearing in July 2008.

25  176.  In October 2007, Plaintiff complained to Defendant VU about the child's placement and the

26    foster parents' inability to meet the child's religious and cultural needs. VU informed Plaintiff

27    that it is not the policy of the OCSSA to place a child based on his racial or religious needs.

28

177. In or around February 2008, CAIR sent letters to Defendant RYAN, the Court, and the Orange County Board of Supervisors again expressing their concern about minor A.I.'s placement and his civil rights to maintain his cultural and religious upbringing and education. Again these concerns went unheeded and no explicit response was received from any party mentioned above, even after a meeting between CAIR and Defendant RYAN to discuss the aforementioned concerns.

178. Around March 2008, Plaintiff was informed that Defendant JORTH was allegedly fearful for her life and teenage children simply based on the fact that Plaintiff had contacted CAIR. Plaintiff also learned that JORTH no longer desired to continue monitoring visitation. (JORTH in the past had made unbecoming remarks about Plaintiff's religious beliefs and culture.)

179. Within a week, Defendant BRODKIN apparently had no difficulty locating a social worker to replace JORTH despite having allegedly spent months trying to find a replacement for her. However, it seems once JORTH resigned from this post, BRODKIN was quickly and immediately able to replace her and visits resumed without a break with a new social worker, NELLIE HERNANDEZ.

180. Senior social worker NELLIE HERNANDEZ monitored visits from around March or April 2008 through July 17, 2008.

181. At the parental rights termination hearing, HERNANDEZ, consistent with her reports made favorable comments about Plaintiff and her ability to monitor and control her son. She testified that Defendant JORTH's allegations and concerns including those concerns regarding her fears for her own safety, as well as allegations regarding Plaintiff's inability to discipline or control the minor, were unfounded. HERNANDEZ testified that she had no concerns for the safety of A.I. in Plaintiff's care.

182. HERNANDEZ also reported that both Plaintiff and her son love each other very much. This fact is undisputed throughout the dependency and has been repeatedly acknowledged by several social workers, Christopherson, therapists Drozd and Yglesias, a bonding study, and the Court.

183. Throughout his assignment to Plaintiff's case, Defendant BRODKIN's reports and court papers were intentionally malicious, fraudulent, fabricated and excluded vital exculpatory information.

184. Defendant BRODKIN did not include *any* of HERNANDEZ's reports or statements in his court reports claiming he had forgotten to include them. As a consequence, none of HERNANDEZ's favorable reports were available to the Court or available to Plaintiff's counsel when the Court received and decided on Plaintiff's three WIC section 388 petitions, which were submitted in February 2008, in June 2008, and in July 2008.

185. At all three hearings for each of these WIC section 388 petitions submitted by Plaintiff, BRODKIN and his employer OCSSA continued to recommend termination of parental rights and adoption of the minor child A.I. by Defendants FORD.

186. The Court, based on the recommendations of the OCSSA agency and Defendants BRODKIN and his supervisor Defendant VU, summarily denied Plaintiff's 388 petitions.

187. As a consequence of the summary denial of these petitions, Plaintiff could not present witnesses or testimony from her therapists, friends, or monitors.

188. On or around Memorial Day 2007, Plaintiff, who lives at Promontory Point overlooking Balboa Island and frequents the Island often, especially during visits with her son, was walking on the Boardwalk on said island when she heard then saw her son swimming in the Balboa Bay. The minor was unable to swim as had been pointed out by Defendants FORD, yet he was allowed to play on a large surfboard in the Bay with no adult present. Further, he was within a few feet of a "Danger" sign placed in the vicinity of a storm drain. Plaintiff did not observe the adult caregivers anywhere until later, when one came out of a home about two houses away from the area where A.I. was swimming. Plaintiff complained to BRODKIN and VU regarding the negligence of Defendants FORD and the safety of A.I. (A.I. later appeared with a full body rash that Defendant JORTH claimed were mosquito bites, but were clearly a rash.)

189. Plaintiff was informed by VU that Defendant BRODKIN had asked Defendant SHELBY FORD about the incident and she denied it. BRODKIN never interviewed the minor or the foster brother, nor made any attempts to question witnesses regarding this incident. Nothing else was done about it.

190. Around May 2008, Plaintiff made several attempts to meet with BRODKIN (whom she had not spoken to nor seen since the October 2007 hearing and who had not returned any of her calls).

191. Plaintiff also made complaints to Defendant VU and Defendant MICHAEL RYAN and others in supervisory roles at OCSSA, that BRODKIN would not return her calls or meet with her despite there still being a chance for her to regain custody of her son under California dependency law.

192. Defendant VU informed Plaintiff that at this point they (OCSSA) are not required to help Plaintiff in anyway to regain custody of her child and that the minor will more than likely be adopted by Defendants FORD.

193. After repeated attempts to speak with Defendant MICHAEL RYAN, Plaintiff was able to do so in June 2008 after threatening to sue the department. MICHAEL RYAN agreed to urge BRODKIN to meet with Plaintiff.

194. A meeting at the social services office occurred in or around June 2008 between Plaintiff, VU and BRODKIN. At this meeting BRODKIN could not articulate any reason why Plaintiff should not be given any unmonitored visits and abruptly ended the meeting. VU claimed that if a parent does not get their child back during the first year of reunification then he/she will not be able to get the child back at all, although California dependency law states no such thing, and even the Court in January 2007 expressed its belief and desire to see Plaintiff reunify with her son.

195. In or around July 2008, minor A.I. reported in front of senior social worker HERNANDEZ that he almost drowned while in the care of his caregivers, Defendants FORD, during a trip to Arizona because non of Defendants FORD were around to help him. He stated: "someone else's parent had to rescue me".

196. Once again none of the SOCIAL WORKER DEFENDANTS investigated this concern nor reported it in their court reports.

197. On or around February 2008, Defendants FORD with the help of SOCIAL WORKER DEFENDANTS submitted a report to the court requesting that the child not be returned to his mother, Plaintiff, NIVEEN. The report was malicious and intended to influence the Court's decision to deny Plaintiff's 388 petition and to terminate her parental rights without just cause.

198. At the parental rights termination hearing in July 2008, Defendant BRODKIN and his counsel presented a report ex-parte to the Court without sharing the report with Plaintiff's counsel. The

1  report was deemed confidential and disclosed prior theft and driving on a suspended license by

2  one of Defendants FORD who were attempting to adopt A.I.

3  199.   At said hearing, Defendant BRODKIN continued to recommend the termination of Plaintiff's

4  parental rights and the adoption of minor A.I. by Defendants FORD even though Defendants

5  FORD's foster care license was under investigation at the time.

6  200.   Despite positive reports by social worker and monitor HERNANDEZ, as well as positive

7  testimony by Ms. Elena Moon who had been present at a recent birthday party that Plaintiff

8  threw for A.I., the Court adopted the recommendation of Defendants BRODKIN and OCSSA to

9  terminate Plaintiff's parental rights and place the child for adoption.

10  201.   The court ordered visits to be assigned to a Consortium, following objections by both county and

11  minor counsels that the Court should not order visits but should delegate it to a Consortium.

12  202.   During the following months, the Consortium did not meet, and Plaintiff was made aware and

13  alleges that OCSSA refused to pay for the Consortium post termination of parental rights.

14  203.   Plaintiff wrote a letter to the Governor whose office sent it to the State Ombudsman. Through

15  the Ombudsman's efforts, OCSSA finally agreed to pay and arrange for the Consortium as

16  ordered by the Court.

17  204.   Shortly after, Plaintiff was informed that the Consortium failed to arrange visits between her and

18  her son due to the refusal of Defendant SHELBY FORD. Plaintiff was also informed and on that

19  basis alleges, that the Ombudsman informed her that certain social workers at the OCSSA

20  convinced Defendant SHELBY FORD that it would not be in the best interest of A.I. to continue

21  these visits.

22  205.   Plaintiff complained to Defendant MICHAEL RYAN who promised to investigate. Plaintiff did

23  not hear back from SOCIAL WORKER DEFENDANTS regarding this complaint.

24  206.   In June 2008 prior to the termination of her parental rights, Plaintiff went to investigate the

25  incident of her son swimming unmonitored in the Bay. She questioned an employee on a boat

26  belonging to the house she believed was responsible for this incident. During this questioning,

27  Plaintiff became aware that the house belonged to the caregiver's uncle. Plaintiff left her name

28  and phone number for the owner to contact her.

207. A week later at the scheduled parental rights termination hearing, Plaintiff was informed that minor's attorney based on a complaint by the caregiver regarding the above incident was issuing a restraining order on Plaintiff.

208. The restraining order was dismissed due to the unavailability of any witnesses to corroborate the allegations.

*209.* At the parental rights termination hearing, Plaintiff's parental rights were terminated without any further showing of parental unfitness. (California is the only state in the country that terminates parental rights using a mere preponderance of the evidence in violation of *Santosky v. Kramer, supra*, 455 U.S. 745. Parental rights are effectively terminated when reunification services are terminated, which in turn are terminated under the preponderance of the evidence. To terminate parental rights at the WIC section 366.26 permanency hearing, all that is needed is a determination that the minor is adoptable.)

210. At the parental rights termination hearing, minor A.I. testified that he loves his mother (Plaintiff NIVEEN) and would like to see more of her, and that he would be sad if he never saw his mother again. Minor A.I. was visibly upset at the idea of never seeing his mother again.

211. At the last scheduled visit, minor A.I., in the presence of social worker HERNANDEZ, cried when informed that this was the last visit with Plaintiff, his mother.

212. Plaintiff is informed and believes, and on that basis alleges, that A.I. had to undergo intense grief counseling therapy as a result of the despicable behavior of SOCIAL WORKER DEFENDANTS and Defendants FORD.

213. In May and July 2008, reports of neglect and abuse were made against Defendants FORD regarding A.I.

214. The investigation revealed that A.I. made statements of sexual molestation (touching of his private parts with the use of an index finger) by the foster brother on a daily basis. The investigating social worker's report revealed that A.I. just "clammed up" and "got real tense" when asked about the touching, and would respond with "I don't know" or "I don't want to talk about it". The social worker reported that the minor was "very verbal about other things," but

"his demeanor really changed after he made the sexual abuse disclosure". Despite all that, the report of neglect and abuse was deemed unfounded.

215. To Plaintiff's knowledge, the report's contents were never disclosed to the Court by OCSSA at the review hearings nor on or prior to the WIC section 366.26 permanency hearing.

216. Plaintiff is informed and believes, and on that basis alleges, that minor A.I. has suffered indescribable emotional and psychological harm as a result of the despicable and malicious acts and omissions of SOCIAL WORKER DEFENDANTS and Defendants FORD.

217. On or around July 2009, Defendants FORD in collusion with SOCIAL WORKER DEFENDANTS issued a temporary restraining order on Plaintiff emanating from an encounter on or around June 2009 on a street that leads to Defendants FORD's residence. As the facts show, Plaintiff was neither harassing, nor did she follow, stalk or approach Defendants FORD.

218. Initially, the temporary restraining order was dismissed. SOCIAL WORKER DEFENDANTS then reissued the same order. This order is presently under review by the California Supreme Court.

219. In a declaration submitted to the Court along with the restraining order for Defendants FORD, Defendant JULIE FULKERSON, the adoption social worker, whom Plaintiff had never met but had spoken to on the phone regarding the status and welfare of her son, made malicious and false allegations including the allegation that FULKERSON had "observed" Plaintiff to be "unstable", this despite the lack of any physical contact between Plaintiff and FULKERSON, and despite FULKERSON's lack of subject matter expertise in the field of mental health and stability.

220. On or around August 3, 2009, FULKERSON testified at a hearing on the restraining order for Defendants FORD, and once again, falsely alleged that Plaintiff was "unstable". Furthermore, FULKERSON alleged that her beliefs were supported by the reports of former social workers. In particular, FULKERSON cited fabricated and false statements from social worker reports dating as far back as 2006, including, but not limited to, false allegations made by WELLBORN and relayed by Defendant MADISON in her Court reports. FULKERSON also alleged that because of Plaintiff's actions, one of the social workers had requested to be removed from the case, without actually specifying which social worker. Plaintiff believes that FULKERSON was either

referring to Defendant WREN or Defendant JORTH, whose departure from the case was not the
result of intimidation or harassment, as described at length above.

221.  Defendant FULKERSON's testimony was malicious and uninformed and misstated the facts.
FULKERSON had never spoken with these SOCIAL WORKER DEFENDANTS, nor was she
present during the course of the dependency to acquire any specific or first hand knowledge.

222.  Despite Plaintiff's objections, FULKERSON's hearsay and double hearsay testimony was
admitted into Court, and was relied on by the Court of Appeal in affirming the judgment, with
specific mention of an unbelievably false allegation made by WELLBORN that Plaintiff had
"pushed her". It was in fact these false allegations made by Defendant WELLBORN, which
culminated in Plaintiff voicing a complaint with CHARLOTTE ANDERSON of NEW
ALTERNATIVES (as explained above) around June 2006, and which also culminated in
Plaintiff's counsel requesting replacement of WELLBORN. However, the reports of SOCIAL
WORKER DEFENDANTS are, as usual, silent on the truth.

223.  In admitting FULKERSON's testimony, the Court violated Plaintiff's right to confront and
question witnesses regarding these allegations, including Defendant WELLBORN and other
SOCIAL WORKER DEFENDANTS, in violation of Plaintiff's due process and procedural
rights under the Fourteenth Amendment and in violation of the California statute of limitations,
evidentiary rules of court and other applicable State and case law.

224.  In December 2009, FULKERSON made similar allegations to the Newport Beach Police
Department (NBPD), falsely alleging that Plaintiff was found to be mentally unstable by the
Court. The record shows that there were never allegations of mental instability except by
SOCIAL WORKER DEFENDANTS, all of which, on the record had been negated by a 730
Evaluation, Plaintiff's therapists, and a bonding study. Despite that, FULKERSON, without any
fear of consequences, made defamatory and libelous statements about Plaintiff, to Detective
FREEMAN of the NBPD. As previously noted, FULKERSON, also without any authority or
court order, faxed a copy of Plaintiff's E.C. 730 confidential forensic psychological evaluation to
FREEMAN, a copy of the December 5, 2005 report by HBPD, copies of the investigative reports
relating to the dependency proceedings, and a copy of confidential child neglect and abuse

reports made against Defendants FORD by OCSSA, all in violation of Plaintiff's rights to

privacy and confidentiality, under the Fourteenth Amendment, and other applicable State and

Federal laws, including California Civil Code section 56.36 and WIC section 827 (a party must

file a petition with the court prior to being granted access to dependency court cases).

225. Plaintiff believes, and on that basis alleges, that Plaintiff's confidential forensic psychological

evaluation which on the cover sheet clearly specifies that it is intended for the Court only, and is

a sealed confidential document that is not a part of the record, is accessible to Defendant OCSSA

and its employees and there is no reasonable way to determine who has been given access to it,

or to whom, and by whom, it has been, or will be transmitted.

226. Plaintiff believes, and on that basis alleges, that the lies fabricated by SOCIAL WORKER

DEFENDANTS, Defendant WELLBORN, and Defendants FORD have and continue to cause

harm to Plaintiff and will continue to cause her harm, unless Plaintiff is able to prevail in seeking

damages and injunctive relief against these Defendants. The most recent harm that Plaintiff has

sustained from the actions and/or inactions of these Defendants were incurred on July 17, 2008,

when her parental rights were terminated; on November 2, 2009, when her cert petition

challenging the termination of her parental rights was denied (see U.S. Supreme Court Docket#

08-10723, requesting a Response on August 27, 2009, and denying cert on November 2, 2009),

thereby eliminating any legal remedies that she may have to restore her parental rights; on or

around August 3, 2009, when a Restraining Order was issued by the Juvenile Court and its

affirmation by the Court of Appeal, Fourth District, Third Division, on April 10, 2010; and on or

around December 3, 2009, when Defendant FULKERSON violated Plaintiff's confidentiality

without a court order. Plaintiff expects her rights to continue to be threatened by these

Defendants in any further civil and/or criminal proceedings. Plaintiff is also fearful of retaliation

by said Defendants unless they are enjoined by an injunctive order.

227. Plaintiff is informed, and on that basis alleges, that Defendant WELLBORN's conduct towards

Plaintiff is not unique. In a recent unpublished opinion, another parent alleged that WELLBORN

was the only monitor to make certain apparently false allegations against her. The opinion noted

that Defendant WELLBORN's testimony also conflicted substantially with her written report,

wherein she had omitted and distorted the facts. (See *Eileen V. v. Superior Court of Orange County* (Aug. 31, 2009, G042090)). On that basis, Plaintiff believes, that Defendant WELLBORN has caused other parents similar irreparable harm to their constitutional rights and the permanent severance of their parental rights, and that, to date, her actions have never been sanctioned by Defendant NEW ALTERNATIVES or Defendant OCSSA.

228. At all times relevant herein, all SOCIAL WORKER DEFENDANTS, and each of them, POLICE DEFENDANTS, and each of them, Defendant WELLBORN and Defendants FORD, acted with malice in fabricating evidence, failing to provide exculpatory evidence, committing perjury, and extracting testimony by duress, fraud, or undue influence, in relation to the removal of minor A.I. from the care and custody of Plaintiff NIVEEN and the investigations and proceedings that resulted there from.

229. Plaintiff is informed and believes, and on that basis alleges, that a reasonable social worker, confronted with the same circumstances presented here, would have known that the continued detention of the minor child was unlawful and that it was a violation of Plaintiff's rights arising under the Fourth and Fourteenth Amendments to the United States Constitution.

230. Plaintiff is informed and believes, and on that basis alleges, that the harm from these malicious false exaggerations and fabrications made by the aforementioned Defendants have continued well into the present and will continue into the future, including, but not limited to, the likelihood of reissuing the restraining order based on false social worker statements, and the likelihood of reintroducing these false statements in any court proceeding, and/or the likelihood of disclosing her confidential medical information without consent or court order.

231. Finally, Plaintiff's parental rights to her only child have been terminated, and Plaintiff's rights to any other children are and will be threatened as a result of the actions and inactions of these Defendants. California dependency laws currently allow for the immediate removal of any child from the custody of a parent whose parental rights have been terminated without any further evidence of detriment. Without injunctive and/or declaratory relief, Plaintiff's rights will continue to be threatened and the damages she has incurred will continue to mount.

232. Plaintiff has complied with the claims-presentation requirement pursuant to Government Code §§ 900 et seq. On June 2, 2010, Plaintiff NIVEEN mailed her claim for monetary damages to the Clerk of the Board of Supervisors for the County of Orange along with a letter requesting an extension of time to file a claim.

### FIRST CLAIM FOR RELIEF:
### VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)
**Fourth Amendment: Forced Entry and Unlawful Search**
**By Plaintiff Against CITY, HBPD, and POLICE DEFENDANTS**

233. Plaintiff realleges, and to the extent applicable, incorporates herein as if set forth in full, paragraphs 1 through 232.

234. Under the circumstances, Plaintiff had a right to be free from unreasonable forced entry, and unreasonable searches under the Fourth Amendment to the United States Constitution.

235. On December 5, 2005, all POLICE DEFENDANTS, and each of them, were acting under color of state law when they agreed, and/or conspired to enter and search the dwelling of Plaintiff. Defendants' conduct was without consent, exigency or court order. (See *Rogers v. County of San Joaquin* (2007) 487 F.3d 1288; *Mabe v. County of San Bernardino* (2001) 237 F.3d 1101). Further, Defendants' actions were taken with deliberate indifference of Plaintiff's rights.

236. POLICE DEFENDANTS, and each of them, conspired to violate the civil rights of the Plaintiff, including those rights found in the Fourth Amendment to the United States Constitution by, but not limited to, entering and conducting an unreasonable search of Plaintiff's home, without a warrant, consent, probable cause, or evidence of exigent circumstances, in violation of Plaintiff's rights to be free from unreasonable forced entry, search and seizure under the Fourth Amendment, as well as those rights under applicable California law rising to the level of a constitutionally protected right.

237. Defendant CITY and its entity HBPD are vicariously responsible for the conduct of the POLICE DEFENDANTS under Government Code section 815.2 and other applicable statutory and case law.

238. As a direct result of these Defendants' violation, and in accordance with 42 U.S.C. Section 1983, Plaintiff's civil rights have been violated in that she has suffered, and will continue to suffer

damages, including, but not limited to, physical and/or mental anxiety and anguish, as well as to incur, and continue to incur, attorneys fees, costs and expenses in the underlying case and in this matter, as authorized by 42 U.S.C. Section 1988 in an amount not yet ascertained, all of which shall be shown according to proof at trial.

239. POLICE DEFENDANTS' wrongful conduct was intentional and malicious, or was done with a willful and conscious disregard for the rights of the Plaintiff. As a result of this despicable conduct, Plaintiff is therefore entitled to recover punitive damages from POLICE DEFENDANTS, only in an amount commensurate with the nature of the Defendants' wrongful acts and amount of the Defendants' wealth.

## SECOND CLAIM FOR RELIEF:
### VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)
#### Fourth Amendment: Unlawful Seizure
By Plaintiff Against CITY, HBPD, and POLICE DEFENDANTS

240. Plaintiff realleges, and to the extent applicable, incorporates herein as if set forth in full, paragraphs 1 through 232.

241. On December 5, 2005, all POLICE DEFENDANTS, and each of them, were acting under color of state law when they agreed, and/or conspired to unlawfully seize, remove, and detain minor A.I. from the home and care of his mother, Plaintiff NIVEEN.

242. Defendants' conduct was without warrant, consent, court order, or other prior authorization. Further, Defendants seized and removed the minor without exigency, i.e. reasonable cause that the minor was in imminent danger of serious bodily injury or death. Furthermore, even if there were exigent circumstances, the scope and degree of the Defendants' intrusion was not justified by the alleged exigency. Finally, Defendants could have chosen the least intrusive path by allowing minor A.I. to remain in the care of neighbor LISA GORDON as she had requested.

243. POLICE DEFENDANTS, and each of them, conspired to violate the civil rights of Plaintiff and her son, including those rights found in the Fourth Amendment to the United States Constitution by, but not limited to, seizing and detaining minor A.I. from Plaintiff's home, without a warrant, consent, probable cause, or exigent circumstances, in violation of Plaintiff's rights to be free

1   from unreasonable seizure of her son under the Fourth Amendment, as well as those rights under

2   applicable California law rising to the level of a constitutionally protected right.

3   244.   Defendant CITY and its entity HBPD are vicariously responsible for the conduct of the POLICE

4   DEFENDANTS under Government Code section 815.2 and other applicable statutory and case

5   law.

6   245.   As a direct result of these Defendants' violation, and in accordance with 42 U.S.C. Section 1983,

7   Plaintiff's civil rights have been violated in that she has suffered, and will continue to suffer

8   damages, including, but not limited to, physical and/or mental anxiety and anguish, as well as to

9   incur, and continue to incur, attorneys fees, costs and expenses in the underlying case and in this

10  matter, as authorized by 42 U.S.C. Section 1988 in an amount not yet ascertained, all of which

11  shall be shown according to proof at trial.

12  246.   POLICE DEFENDANTS' wrongful conduct was intentional and malicious, or was done with a

13  willful and conscious disregard for the rights of the Plaintiff. As a result of this despicable

14  conduct, Plaintiff is therefore entitled to recover punitive damages from POLICE

15  DEFENDANTS, only in an amount commensurate with the nature of the Defendants' wrongful

16  acts and amount of the Defendants' wealth.

### THIRD CLAIM FOR RELIEF:
### VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)
#### Fourteenth Amendment
#### By Plaintiff Against CITY, HBPD, and POLICE DEFENDANTS

20  247.   Plaintiff realleges, and to the extent applicable, incorporates herein as if set forth in full,

21  paragraphs 1 through 232.

22  248.   Commencing on December 5, 2005, POLICE DEFENDANTS, and each of them, were acting

23  under color of state law when they acted, agreed, and/or conspired to unlawfully detain minor

24  A.I. from his home and the care of his mother, Plaintiff NIVEEN. Defendants did so without

25  proper justification or authority or court order.

26  249.   POLICE DEFENDANTS, and each of them, conspired to violate the civil rights of Plaintiff

27  NIVEEN, including violation of several rights found in the Fourteenth Amendment to the United

28  States Constitution, by, but not limited to, removing and detaining, minor A.I. from the care,

custody, and control of his mother, Plaintiff NIVEEN, without proper or just cause or court order, notice, or post-deprivation hearing; by subjecting A.I. to direct physical examinations without consent, authority, or the presence of his mother; and by creating and using false and fabricated evidence and testimony and failing to provide exculpatory evidence during the pendency of the dependency proceeding in violation of Government Code §820.21, and the Constitutional rights of the Plaintiff.

250. By these actions, Defendants interfered and/or attempted to interfere with Plaintiff's constitutional rights to substantive and procedural due process, familial relations, and privacy under the Fourteenth Amendment to the United States Constitution, as well as those rights under applicable California Law rising to the level of a constitutionally protected right.

251. Defendant CITY and its entity HBPD are vicariously responsible for the conduct of the POLICE DEFENDANTS, under Government Code section 815.2 and other applicable statutory and case law.

252. As a direct result of these Defendants' violation, and in accordance with 42 U.S.C. Section 1983, Plaintiff's civil rights have been violated in that she has suffered, and will continue to suffer damages, including, but not limited to, physical and/or mental anxiety and anguish, as well as to incur, and continue to incur, attorneys fees, costs and expenses in the underlying case and in this matter, as authorized by 42 U.S.C. Section 1988 in an amount not yet ascertained, all of which shall be shown according to proof at trial.

253. POLICE DEFENDANTS' wrongful conduct was intentional and malicious, or was done with a willful and conscious disregard for the rights of the Plaintiff. As a result of this despicable conduct, Plaintiff is therefore entitled to recover punitive damages from POLICE DEFENDANTS, only in an amount commensurate with the nature of the Defendants' wrongful acts and amount of the Defendants' wealth.

**FOURTH CLAIM FOR RELIEF:**
**VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)**
**Fourteenth Amendment**
**By Plaintiff Against COUNTY, OCSSA, SOCIAL WORKER DEFENDANTS, Defendants WELLBORN, NEW ALTERNATIVES, and Defendants FORD**

254.  Plaintiff realleges, and to the extent applicable, incorporates herein as if set forth in full, paragraphs 1 through 232.

255.  SOCIAL WORKER DEFENDANTS, and each of them, Defendant WELLBORN, and Defendants FORD, were acting under color of state law when they acted, agreed, and/or conspired to unlawfully continue to detain minor A.I. from his home and the care of his mother, Plaintiff NIVEEN.

256.  SOCIAL WORKER DEFENDANTS, and each of them, Defendant WELLBORN, and Defendants FORD, conspired to violate the civil rights of Plaintiff NIVEEN, including violation of several rights found in the Fourteenth Amendment to the United States Constitution, by, but not limited to, detaining, and continuing to detain, minor A.I. from the care, custody, and control of his mother, Plaintiff NIVEEN, without proper or just cause; by subjecting A.I. to direct physical examinations without consent, authority, or the presence of his mother; by the use of coercion and duress to obtain evidence and testimony; by discriminating against Plaintiff on the basis of her social status, her racial and religious background, and her unique individual traits; by disclosing privileged medical and mental health information, and dependency court records, without proper authority in violation of California Civil Code section 56.36, WIC section 827, and Plaintiff's Fourteenth Amendment rights to substantive due process and privacy; and by using false and fabricated evidence and testimony and failing to provide exculpatory evidence during the pendency of the dependency proceeding in violation of Government Code §820.21, and the Constitutional rights of Plaintiff under the Fourteenth Amendment.

257.  By these actions, Defendants interfered and/or attempted to interfere with Plaintiff's constitutional rights to substantive and procedural due process, familial relations, privacy, and equal protection under the Fourteenth Amendment to the United States Constitution, as well as those rights under applicable California Law rising to the level of a constitutionally protected right.

258.  Defendant COUNTY and its entity OCSSA, and Defendant NEW ALTERNATIVES, are vicariously responsible for the conduct of the SOCIAL WORKER DEFENDANTS, Defendant

1    WELLBORN, and Defendants FORD, under Government Code section 815.2 and other

2    applicable statutory and case law.

3    259.   As a direct result of these Defendants' violation, and in accordance with 42 U.S.C. Section 1983,

4    Plaintiff's civil rights have been violated in that she has suffered, and will continue to suffer

5    damages, including, but not limited to, physical and/or mental anxiety and anguish, as well as to

6    incur, and continue to incur, attorneys fees, costs and expenses in the underlying case and in this

7    matter, as authorized by 42 U.S.C. Section 1988 in an amount not yet ascertained, all of which

8    shall be shown according to proof at trial.

9    260.   Defendants' wrongful conduct was intentional and malicious, or was done with a willful and

10   conscious disregard for the rights of the Plaintiff. As a result of this despicable conduct, Plaintiff

11   is therefore entitled to recover punitive damages from these Defendants, only in an amount

12   commensurate with the nature of the Defendants' wrongful acts and amount of the Defendants'

13   wealth.

14                            **FIFTH CLAIM FOR RELIEF:**
                    **VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)**
15                            **First and Fifth Amendments**
           **By Plaintiff Against COUNTY, OCSSA, and SOCIAL WORKER DEFENDANTS**
16

17   261.   Plaintiff realleges, and to the extent applicable, incorporates herein as if set forth in full,

18   paragraphs 1 through 232.

19   262.   SOCIAL WORKER DEFENDANTS, and each of them, were acting under color of state law

20   when they acted, agreed, and/or conspired to unlawfully interrogate Plaintiff and her son through

21   the use of coercion and duress, without authority or the presence of counsel, and when they

22   acted, agreed, and/or conspired to prevent Plaintiff from exercising her First Amendment Rights

23   to free speech with her son and her friends, to direct her son's religious and educational

24   upbringing, to have a third party present at visits, and to videotape the visits.

25   263.   SOCIAL WORKER DEFENDANTS MADISON, MOLINA, VARGAS, WREN, BRODKIN,

26   VU, and RYAN, and each of them, conspired to violate the civil rights of Plaintiff NIVEEN,

27   including violation of several rights found in the First Amendment to the United States

28   Constitution, by, but not limited to, preventing Plaintiff from communicating freely with her son

and her friends during visits; violating Plaintiff's free exercise right under the First Amendment, her right to equal protection under the Fourteenth Amendment, and her rights under the Civil Rights Act, when placing the minor in foster care with deliberate disregard for the fact that both the minor and Plaintiff are Muslims; violating Plaintiff's and minor's rights under the Establishment and Free Exercise Clauses of the First Amendment and the Civil Rights Act, by refusing to place or transfer the minor to a family with the same religious and cultural background that would enable the minor to practice his religion and preserve his culture, despite the availability of at least two such appropriate and licensed families, and repeated attempts by Plaintiff and other organizations on Plaintiff's behalf to assert Plaintiff's and minor's civil and constitutional rights and demand his transfer; preventing third parties from being present at visits in public; disallowing the videotaping of visits even in public; preventing Plaintiff from directing the educational needs of her child; and preventing Plaintiff and her son from attending conjoint therapy, all in violation of Plaintiff's First and Fourteenth Amendment rights, and applicable state, federal and case law. (See *Bruker v. City of New York*, 337 F. Supp. 2d 539 (S.D. N.Y. 2004)).

264.  SOCIAL WORKER DEFENDANTS TAYLOR, MERVILUS, MADISON, VARGAS, WREN, and BRODKIN, and each of them, conspired to violate the civil rights of Plaintiff NIVEEN, including violation of several rights found under the Fifth Amendment to the United States Constitution, by, but not limited to, interrogating and continuing to interrogate Plaintiff and attempting to interrogate the minor without consent, authority or the presence of counsel; threatening that Plaintiff would not be able to regain custody of her child without a full admission of guilt; using the child as a means to coerce Plaintiff into self-incrimination, all in violation of Plaintiff's Fifth Amendment Constitutional rights.

265.  By these actions, Defendants interfered and/or attempted to interfere with Plaintiff's constitutional rights guaranteed to her under the First and Fifth Amendment to the United States Constitution, as well as those rights under applicable California Law rising to the level of a constitutionally protected right.

266.  Defendant COUNTY and its entity OCSSA are vicariously responsible for the conduct of these SOCIAL WORKER DEFENDANTS under Government Code section 815.2 and other applicable statutory and case law.

267.  As a direct result of these Defendants' violation, and in accordance with 42 U.S.C. Section 1983, Plaintiff's civil rights have been violated in that she has suffered, and will continue to suffer damages, including, but not limited to, physical and/or mental anxiety and anguish, as well as to incur, and continue to incur, attorneys fees, costs and expenses in the underlying case and in this matter, as authorized by 42 U.S.C. Section 1988 in an amount not yet ascertained, all of which shall be shown according to proof at trial.

268.  Defendants' wrongful conduct was intentional and malicious, or was done with a willful and conscious disregard for the rights of the Plaintiff. As a result of this despicable conduct, Plaintiff is therefore entitled to recover punitive damages from these Defendants, only in an amount commensurate with the nature of the Defendants' wrongful acts and amount of the Defendants' wealth.

## SIXTH CLAIM FOR RELIEF:
## VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1985)
**By Plaintiff Against ALL SOCIAL WORKER DEFENDANTS, ALL POLICE DEFENDANTS, Defendants WELLBORN, NEW ALTERNATIVES, and Defendants FORD**

269.  Plaintiff realleges, and to the extent applicable, incorporates herein as if set forth in full, paragraphs 1 through 232.

270.  SOCIAL WORKER DEFENDANTS, and each of them, POLICE DEFENDANTS, and each of them, Defendant WELLBORN, NEW ALTERNATIVES, and Defendants FORD, conspired to deprive PLAINTIFF of her rights under the laws of the United States. Specifically, SOCIAL WORKER DEFENDANTS, POLICE DEFENDANTS, Defendant WELLBORN, and Defendants FORD, conspired to continue the detention of minor A.I. from his home and the care of his mother NIVEEN, without probable cause that the minor was in imminent danger of serious physical injury, by fabricating, exaggerating and falsifying evidence, and presenting fabricated, inaccurate and malicious reports and failing to disclose exculpatory evidence.

271.    In addition, SOCIAL WORKER DEFENDANTS, and each of them, Defendant WELLBORN, and Defendants FORD, conspired to detain minor A.I. beyond a reasonable period after the basis for detention was negated; and conspired to use trickery, duress, fabrication, and/or false testimony or evidence, and failed to disclose exculpatory evidence, in preparing and presenting reports and court documents to the Court, causing an interference with the Plaintiff's rights, including those as to familial relations.

272.    DEFENDANTS, and each of them, engaged in said conspiracies for the purpose of depriving Plaintiff NIVEEN of equal protection of the laws of the State of California and of the United States. The conspiracy was motivated by invidious discrimination against Plaintiff on the basis of her cultural, racial and religious background, as evidenced by their insistence on probing questions regarding Plaintiff's birth place and information on her family despite her family's non involvement in the case and their residency overseas. This is further evidenced by derogatory remarks regarding Plaintiff's eastern style of parenting and their insistence that such a style is inadequate for ensuring the safety of the minor and his return to Plaintiff's care and custody. Further, some SOCIAL WORKER DEFENDANTS, including Defendant JORTH made derogatory racial and religious statements. For example, Defendant JORTH asked probing and inappropriate questions about Plaintiff' religious beliefs in the presence of minor A.I., and made malicious allegations that she was in fear for her life and her teenage children's lives simply because Plaintiff had contacted CAIR.

273.    Plaintiff believes, and on that basis alleges, that the conspiracy was also motivated by personal dislikes of Plaintiff's personality and lifestyle, as pointed out by Dr. Drozd to the Court, and as can be seen by continual derogatory remarks regarding Plaintiff's demeanor, walk, dress, appearance, lifestyle choices, hygiene, and personality, as well as by malicious allegations by SOCIAL WORKER DEFENDANTS that Plaintiff suffers from some undiagnosed mental illness, solely based on her unique personality, despite expert testimony to the contrary.

274.    Plaintiff also believes, and on that basis alleges, that DEFENDANTS' discriminatory behavior also stemmed from their inability to understand and accept individual and cultural differences, and differences in beliefs and parenting styles which often stem from different upbringings, and

their unwillingness to accept that parents have a constitutional right to implement their own parenting style without undue influence from the government, and that "adequate parenting skills" per the perceptions of individual or collective social workers, is not a sufficient legal excuse to deprive Plaintiff and her son from their Fourteenth Amendment right to familial association and privacy, as it does not fulfill a strong government need but infringes significantly upon family integrity and the rights of parents to direct the upbringing of their children.

275.   Plaintiff also believes, and on that basis alleges, that DEFENDANTS discriminated against her on the basis of her obsessive compulsive traits, which, while harmless in and of themselves, create an impression in the minds of said DEFENDANTS that Plaintiff suffers from an undiagnosed mental illness despite expert testimony that she in fact did not. These allegations extending throughout the dependency hearings, were conducted in the form of a "witch-hunt", forcing Plaintiff to retake the MMPI-2 psychological tests three times, in order to prove that the results were indeed accurate (which they were), and that these false allegations were in fact the basis for the continued detention of the minor since his removal on December 5, 2005.

276.   Plaintiff also believes, and on that basis alleges, that DEFENDANTS discriminated against her due to her status as a single parent with no family support in the States, evidenced by continual allegations that because Plaintiff does not have a "support system" she would not be able to care for her child. (When Plaintiff did in fact build a support system, these DEFENDANTS refocused their efforts to sabotage the return of the minor, by falsely alleging inadequate parental judgment, that minor's behavior was dysfunctional and that Plaintiff cannot control him.)

277.   Plaintiff also believes, and on that basis alleges, that DEFENDANTS' conspiracy was driven by greed to steal the minor, stemming from the minor's highly adoptable qualities, including his "endearing personality", his above-average intelligence, his blond hair and attractive features, his loving loyalty, and his sweet demeanor.

278.   Plaintiff is informed, and on that basis alleges, that Defendants FORD wanted to sabotage the reunification process in order to keep the minor to themselves, without any regard for the minor's mental health and happiness and his, as well as Plaintiff's, rights to familial association.

279.    Plaintiff is informed, and on that basis alleges, that SOCIAL WORKER DEFENDANTS, and each of them, and Defendant OCSSA are motivated by federal and state incentive programs, including but not limited to, Title IV-E and ASFA funds, to continue the detention of children and to adopt them out.

280.    Plaintiff is informed, and on that basis alleges, that Defendant WELLBORN was aware that her reports of the visits played an important decisive role in the outcome of Plaintiff's case and that she deliberately and intentionally fabricated malicious lies in order to harm Plaintiff without any justification, and/or conspired with Defendant MADISION to fabricate these outrageous lies.

281.    Plaintiff believes, and on that basis alleges, that NEW ALTERNATIVES and its director CHARLOTTE ANDERSON are aware of their employees' behaviors, and are intentionally negligent in investigating Plaintiff's and other parents' complaints and in screening, training, supervising and disciplining their employees; and that their intentional negligence despite this knowledge rises to the level of co-conspirators in depriving Plaintiff and her son of their constitutional rights.

282.    DEFENDANTS, and each of them, took several acts in furtherance of the conspiracy, including but not limited to: procuring false evidence, fabricating evidence, distorting the truth and the facts, failing to disclose exculpatory evidence in preparing and presenting reports and court documents to the Court in relation to the dependency proceedings, failing to provide timely discovery and reports to Plaintiff and her attorneys, refusing to visit Plaintiff's home to assess its appropriateness, intentionally sabotaging the reunification, by limiting Plaintiff's visitations and her ability to visit with her son outside of SOCIAL WORKER DEFENDANTS' facilities, refusing to allow Plaintiff to attend her son's physical and mental health examinations and assessments, refusing to allow Plaintiff and her son conjoint therapy, failing to pay for Plaintiff's therapy as required by the case plan and then alleging that Plaintiff was getting a biased opinion *because* she was paying for the therapy herself, failing to investigate Plaintiff's concerns regarding the safety of her son with Defendants FORD, failing to disclose the criminal background of Defendants FORD to Plaintiff's counsel and presenting the information ex-parte to the Court, failing to disclose the distress and emotional harm the minor was experiencing as a